If counsel is ready, you may proceed. May it please the court. Good morning, I am attorney editor Flores, representing Mr. Donatan Henriquez-Dubon, the petitioner. I would like to reserve two minutes for rebuttal. Okay, we'll try to help you out, but keep an eye on the clock. I promise I will, your honor. At the heart of this case is if substantial evidence does not support an adverse credibility finding, there cannot be a finding that Mr. Henriquez engaged in alien smuggling. This is the case because an adjudicator cannot reasonably conclude here that Mr. Henriquez committed the act of alien smuggling without first making an adverse credibility finding of Mr. Henriquez's testimony. The testimony Mr. Henriquez provided at the Master Calendar hearing on March 19, 2018, amounts to a total of 15 pages of testimony, starting on page 19 of the administrative record. At odds are 15 pages of testimony versus three lines of testimony. In those three lines of testimony, Mr. Henriquez recanted by clarifying that when he testified he paid $5,000 and $6,000 for his stepson Gabriel and wife Claudia to enter the U.S., he was confused by the question and he was referring to the amount his wife Claudia and biological father of his stepson Gabriel paid, not him. However, as stated in the immigration judge's order found on page 74 of the administrative record, the immigration judge did not find that his recantation to be persuasive, considering the initial admission he made. No further explanation was provided by the immigration judge, and hence no insight as to how he reached Mr. Henriquez's adverse credibility finding. If 15 pages of testimony could be ignored and instead reduced to solely three lines of testimony, then perhaps Mr. Henriquez would agree substantial evidence supports the adverse credibility finding, or in the alternative that he failed to establish good moral character. But fortunately, this court requires more, and requires that the whole record be considered. And in doing so, a reasonable adjudicator would be compelled to conclude to the contrary of the BIA and immigration judge's findings. So can I just stop you there? I think you just said this, but I just want to confirm, is it your, would you agree that what you need to show to prevail here is that any reasonable adjudicator looking at this testimony would be compelled to conclude that the recantation was correct and the initial statement was the product of confusion or poor translation or something else? Is that what you need to show? Thank you, Judge Minner. Yes, Your Honor, I agree with that. Well, let me ask it a slightly different way. If it was a mistranslation, it would not have been a recantation, it would have been a correction. That is correct, Your Honor. Let me ask you a question about the test of the, what in that IJ's view was the fatal testimony. He's asked in English, I'm at the AR-96, and what about your son Gabriel? This is a question from the judge. Did you pay him money so that he could be brought to the United States? As I repeat to you, well, yeah, it was partially. We don't have the Spanish. And I'm not myself a Spanish speaker. Are you? And my question is, if you are, would that have been translated in Spanish into the passive voice so that is not specified in the Spanish? Who's paying? Your Honor, yes, but if I could slightly elaborate as to and allow for all of you to join me in that courtroom at the time that the hearing was taking place. Prior to that specific question, Your Honor, on six separate occasions, Mr. Enriquez had already specified that he had in no way been involved, nor had he engaged in paying or bringing his wife Claudia or son to the U.S. in La Jolla. And, Your Honor, if I could point your attention to page 95, line 12. Mr. Enriquez is providing an answer, and I'll read it verbatim. My wife, she sent for him, period, right? The reason I'm drawing specific attention to that right question mark is because at this point, he had already been asked six times the same exact question. And at this point, Mr. Enriquez is out loud asking, is this what you want to hear? Because he is confused by the same questions been asked the same time. On top of that, Your Honor, the fact that he stopped using a translator further down the transcript, as you all saw, makes it again abundantly clear that there was confusion in the courtroom, both from the line of questioning and from the translator that was being used. And this is not to minimize the work of the translators. It is incredibly important in a courtroom. But when the same question is asked so many different times and in different ways, because the same question was asked repeatedly, but in different ways, with special emphasis by the immigration judge saying, remember, you're on the record, you're on the road. Those specific qualifiers in the translation to Spanish were confusing. And in fact, Your Honor, there is a question where specifically Mr. Enriquez used the word partially. It's in administrative record page 97. It's line two. He says, as I repeat to you, well, yeah, it was partially in answering the question of and what about your son Gabriel? Did you pay him, pay him money so that he could be brought to the United States? That particular question is of importance, Your Honor, because, again, Mr. Enriquez is saying yes, partially because previously he has said he paid one thousand two hundred dollars. You know, if you could answer my question, I'd appreciate it. Maybe you don't know the answer. Are you a Spanish speaker? I am not. I am. I am, Your Honor. What I'm asking is we have the English version of that question at the bottom of page 96. What about your son? Did you pay him? If that was translated into Spanish because he was hearing the question in Spanish rather than English at this point. Would that question have been asked in the in the passive voice? Was money paid? You know. Yes, Your Honor. But yes, the short answer and the quick answer is yes, Your Honor. The other the other point that I forgot to make specifically as it as it pertains to this particular line of questioning, Your Honor, is already at four or five different occasions during this exchange. I had raised my hand and indicated to the immigration judge that I think there was confusion in the room and that there was a misunderstanding as to the translator. And I was trying to allude to that, Your Honor, and multiple times signaling the court. Now, out of respect, I did not interject, Your Honor. And I had waited. It wasn't until he said about six that the immigration judge made the point, OK, he's not eligible because he cannot prove good moral character. They went off the record. And it was at that point that there is an exchange off the record and that I was allowed to come back and make certain clarifying statements. Now, I am not suggesting by any means that. The translator or the judge were purposefully trying to pin Mr. Enriquez to state something incorrectly, but however, it is obvious to me based on the 15 pages, the three pages prior leading to the inconsistent statement and the pages that followed. He was always consistent and made the point that he was referring to Claudia Payne and biological father of his stepson, Gabriel. And none of those questions, Your Honor, would have been ever asked had the immigration judge not speculated that Claudia knew Mr. Enriquez prior to her traveling to the U.S. and had the immigration judge not speculated that Gabriel was actually by the biological son when, in fact, he was a stepson. Those those are the reasons why the same exact question were asked in different ways seven times. And that's what I believe, Your Honor, led to to this point of confusion and led Mr. Enriquez to believe that the question that was just being posed to him is how much was paid rather than what he paid. And, Your Honor, I do know that we are at one minute on the clock. I don't know if Your Honor would like for me to address any other particular point or question. Could I ask you just a point of information? I assume when the questions were being asked at the hearing, they were asked in English. And then the translator would translate. Your client understood English. So he would have he would have heard the question in English. I don't know how well he spoke English. I often have cases here in the district court where we use translators. And then it turns out that the usually the defendant clearly could speak and understand English. It's just that it's a more of a comfort level. So he understood English. The questions were asked in English and they were translated again. Thank you, Mr. Corman. Yes, Your Honor. He did understand English partially. However, the point that we the point we really want to drive here is that he did understand English slightly. is why Mr. Enriquez decided to completely stop using the translator. Because he did not feel that the question that he was receiving in his headset and the answer that he was transmitting were being adequately captured, Your Honor. Let me interject here. As I understand it, when he moved from Spanish to English, he took off his earphones, from which I infer that he's hearing the Spanish through his earphones. And as the English question is being asked, he has earphones on. So I'm not sure he's hearing the English. He does after the earphones are taken off. But when this question is being asked in English, he has earphones on and he's hearing the Spanish translation through his earphones. So I'm not sure what he heard in English. Is that right that he has earphones on? Yes, he does. The whole time he has headphones on up until the point that on the record, he removes it, removes them. And the immigration judge acknowledges that the fact that he has taken them off. So I'm not sure that he heard the English on this question. Did you pay for your son? I rather suspect he did not. Your Honor, the only point that I would make here is even if he was hearing some of the question, because it was being translated simultaneously into Spanish, as the question was being asked, he would only hear part of the question. And the same is true with the response that the translator would give once his remarks were translated into English. Thank you, Counsel. We've taken you over time, but we'll give you two minutes for rebuttal. Thank you, Your Honor. And we'll hear from the government now. Good morning. Is it morning there? Good morning. Abigail Leach for the respondent. This case, the record does not compel a reversal of the agency's determination that the petitioner failed to establish the requisite good moral character for having engaged in alien smuggling. I'd like to point out that it is the applicant's burden of proof to establish eligibility for their requested relief. And where there is any bar to that relief that may arise, it is also the applicant's burden to show by preponderance of the evidence that the bar does not apply. This case, this court reviews the agency's determination for substantial evidence, finding a fact for substantial evidence, which is a highly deferential standard of review. And the court may not reweigh facts and evidence, but must consider whether any reasonable adjudicator would be compelled to find to the contrary from the agency's finding. In other words, this court must find that the facts within the record not only support the alternative conclusion, but compel it. Let me ask you this, if I can. I'm looking at what I think is the faithful question. I'm at the bottom of year 96 and then over to the top of 97. The judge asked in English, I wonder about your son, Gabriel. Now, of course, that's already not quite right. It's his wife's son. Did you pay him money so that he could be brought to the United States? As I repeat to you, so he doesn't sound as though he's thinking he's contradicting what he said earlier. Well, yeah, it was partially. Now, partially makes sense if what he's saying is, well, I paid for him once he was in the United States, which is uncontested, which he says at the beginning. Yes, I helped him when they when when the immigration people called me up and asked me if I would pay for his flight within the United States. We know that. So partially, but partially makes only makes sense if he's paid part of it. Somebody else paid another part of it. The only other part that could be at issue would be coming into the country. So as I read that answer and he says, as I repeat, in other words, I'm being consistent with what I said before and I paid partially. That sounds to me as though the question had to have been in Spanish as he understood it. Well, did you pay or was what was their payment for your son's transportation? I mean, otherwise, that answer makes no sense. I guess I'm not sure exactly what you're answering or asking, but let me let me offer this. Here's what I'm asking. It is to say, I see no way to interpret his answer in the way that the immigration judge interpreted it, because he says, number one, I'm repeating to you what I've already said. In other words, as I repeat to you, and then he says, I paid partially. Well, the only way to make sense of I paid partially is he paid some of the money for the son's transportation. Somebody else paid for the other part. And he's already testified that he's paid for the transportation within the United States when he was when he was contacted by the immigration people. So I don't I don't understand how this sentence can be understood as saying that he paid to smuggle the son. So as an initial matter, I'd like to point out that this court has held that alien smuggling applies to a broad range of conduct. And I believe it's Ursula Kovar Rubio's that is referenced in the agency's decision. Alien smuggling ends at the last point where the smuggler goes, the point of departure. However, he there is any dispute as to whether the immigration people called him and asked him to pay for the transportation within the United States. Obviously, that is that an issue? Well, there's there's no evidence to support that. But here with the agency basis finding on is the fact that he said, I did pay five thousand dollars. And only after he was told and in his opening brief, he says, after much explanation, only after much explanation off the record with his attorney who told him that he was no longer eligible for cancellation of removal because he said he paid the five thousand dollars. Did he recant that testimony and said he had nothing to do with it? However, throughout his recantation, he says, I had nothing to do with it. I had nothing to do with it. And then he also says, I helped her after we got together. And then he also says it was just her. It was just her. It was just her. And then when asked again, no, no. Gabriel's dad also paid. So there's at best there's confusion about whether or not he paid where there's two permissible views of the evidence in the record. The immigration judges interpretation of the evidence cannot be incorrect. And this court cannot reweigh the facts and evidence on the record, even if it would have weighed evidence differently had it been the trier of fact. If substantial evidence supports the agency's finding in that the court is not compelled to conclude to the contrary, substantial evidence supports the agency's underlying finding here. Can I ask you to address a few lines down on page 97, where it seems like after he says he paid five thousand dollars for his son, he says he admits to paying six thousand dollars for his wife. Now, he later testifies without apparent contradiction that he wasn't married to her at the time she came to the United States. So that part of the answer and they only met afterwards. So that statement doesn't really make any sense. And the immigration judge rather conspicuously did not rely on the admission to paying for the wife. So to the extent that the immigration judge seems implicitly to have found that part of it didn't make sense and wasn't worthy of reliance. Why is the admission of the son worthy of being relied on? Well, as you say, the agency's determination is only based on the paying for the son to enter the United States. The Supreme Court held in Ming Dai that the deemed to be credible rule was overturned by the Ninth Circuit. It's no longer a rule. And the INA requires a review in court to accept the administrative findings of fact as conclusive, unless any reasonable adjudicator would be compelled to find to the contrary. Ming Dai also said that the court may accept some of the testimony, but it does not need to credit all of the testimony. I can't read into or provide an answer why the immigration judge did not rely on the statements regarding his wife. But the basis of the agency's decision is that he testified he paid $5,000 after much evasiveness and non-responsive. As opposing counsel pointed out, he was asked six different times how his son came to the United States. And he was arguably evasive, non-responsive at best in providing the answer. But he was not confused with the question where the immigration judge asks on page 93 in the record, how did he come to the United States? And he answers a non-answer, but perhaps to get the heat away from looking into his son. He's waiting for a permit. And then he says, did you understand my question? And he provides a response that says he came like all the rest of us. That's an evasive response. The immigration judge is reasonably confused and reasonably would like an answer to evaluate petitioner's statutory eligibility for the relief that he's requesting. So he asks again and petitioner again provides non-responsive evasive question. However, when directly asked, did you assist Gabriel in coming to the United States? Not at any point, not did you pay for him when he got here? Not did immigration pick him up directly? Did you assist Gabriel in coming to the United States from wherever he was before? He says, the truth is I did. Well, but read the next two exchanges, please. And how did you do it? And then how did you? I apologize. Continue. I apologize. Well, then, so read his answer. How did you assist him? He said, I helped him because immigration picked him up. And then later, on 95. And please read the next sentence. Well, he didn't come alone, did he? Is that what you're referring to? No. Stop. The truth is I did. Then how did you assist him? And then he answers. Well, I just helped him because immigration picked him up. They told me to pay his flight because he was in. That's the truth is I did. Tell me about it. He says, well, immigration called me and I paid. I paid the money once he was here. That's what he meant. There's there's no proof in the record that he only paid for that flight. There's no proof in the record that he didn't participate in alien smuggling. And I'd like to reiterate that it is his burden to prove by a preponderance of the evidence that the bar does not apply to him. He argues only in his opening brief that he was confused, nervous and anxious. He doesn't point to anything, although except for the inconsistent and evasive non answers that he provided during his testimony. He doesn't point to any other testimony, any evidence in the record or any case law to support his point. But the record that the record compels the contrary finding. That's because the record does not compel a contrary finding. I apologize. I seem to have gone over my time. The government requests that the court deny the petition for review. There are no further questions from the panel. Thank you. Oh, yeah. No, no, no. No further questions. Sorry. Thank you, Ms. Leach. Mr. Flores, two minutes. Thank you, Your Honor. And I wanted to once again. And I appreciate the court's candor and allowing me these additional two minutes. I just I wanted to very specifically go back to the language because the language itself speaks for itself. Page 93 of the transcript. Lines 10 is that and how did he come to the United States? Referring to Gabriel. This is the very first time he's asked. He says his mother had him come first time. He explains that it wasn't him. You skipped a few lines. He answers that. Correct. Your Honor. But then in page 94. OK. And did you assist Gabriel in coming to the United States? Again, the truth is I did. Well, I just helped him because immigration picked him up. They told me to pay his flight because he was in. I don't remember where he was. Page 95. The judge asked, OK, so how did he come here? And again, he answers my wife. She sent for him. Right. Immigration picked him up afterwards. There was he was waiting for the turn for him. Come over to here to her. Then she paid so that they would. And then the immigration judge interrupts him, Your Honor. And this is significant. He's providing once again a very consistent statement to his two previous statements. But the judge interrupts because the judge is not interested in hearing his consistency and hearing what he's already explained. And that's because he was speculating at this time that he was the father, the biological father, and that he met his wife prior to her entry in the US. That's why he interrupts him and doesn't allow him to continue to explain what he's clearly stated already. Judge in page 95 says, Sir, what what I mean is, did you pay a smuggler so that your son could be brought to the United States? Page 95, line 19. I didn't pay him. OK, what about your wife? Did you pay for her to come to the United States? No, because I wasn't with her at that time. Page 96, lines four and five. OK, so you're saying under oath today you did not pay money for your wife to come to the United States. I didn't help my wife. Not then because I wasn't. We met, got married here. At any other hearing, if there was government counsel asking these questions, your honor, I would have had the opportunity to interject and ask an answer. You know, we're taking you over time, but maybe I should ask one more question. Perhaps it should have been a question of the government that the IJ is clearly under the impression that Gabriel is his son, not the son of his wife, not the son of another man. The IJ chooses to interpret his answers adverse to him, I think, in light of the fact that he thinks this is his son. That makes it much more highly probable, of course, that he himself would have paid. The IJ, in other words, was laboring under what's obvious on his face, a misapprehension of fact that made the IJ's conclusion much more likely to be true. But absent that, if he had known that it was not his son, but rather his wife's son, I'm not at all sure the IJ would have come to the same conclusion. Thank you, your honor. And yes, it's the speculation that the immigration judge had that led to the line of questioning. Had he not speculated those two facts that were incorrect, then he would have stopped when the question was asked six times. And it is reasonable and it makes sense why Mr. Enriquez, after being asked the same thing for a seventh time, is saying, well, if you say it that way, yes. Because now he's trying to convince himself that I'm not being asked what I paid, but what was paid for them. And he's saying, me, I partially paid 1,200. And then he's saying, but for my son, 5,000 was paid and for my wife, 6,000 were paid. And no further questions were asked. Why ask the same questions six times? Thank you for answering my question. There are no further questions. Thank you. We have your argument. Thank you. I thank both sides for their helpful arguments. And the case is submitted. We are adjourned for the day. Thank you. This part for this session stands adjourned. Thank you, Miss Leach. Thank you.
judges: FLETCHER, MILLER, Korman